**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

ZOAN BAPTIST CHURCH, a )
Virginia not-for-profit corporation )
    5888 Plank Road )
    Fredericksburg, VA 22407 )
     )
    Plaintiff, )
     )
v. )    Case No. **3:17-CV-475**-JAG
     )
SPOTSYLVANIA COUNTY, a Virginia )
municipal corporation, )
Serve: 9104 Courthouse Road )
    Spotsylvania, VA 22553 )
     )
    Defendant. )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Zoan Baptist Church, a Virginia not-for-profit corporation ("Church"), by and through its attorneys, complains against the Defendant, Spotsylvania County, Virginia, a municipal corporation, ("County") as follows:

### NATURE OF THE CASE

1.    This case is about the County's efforts to prevent the Church from operating its educational ministry at the Church's property unless the Church submits to a burdensome, expensive, and ultimately unnecessary special use application.

2.    The Summit Academy is a ministry of the Church devoted to religious secondary education.

3.    Not only is the educational ministry an integral part of the Church, it also qualifies as an accessory use to the Church and should therefore be permitted at the property as

of right. The Church's right to continue operating the ministry is further protected by federal statute and the United States Constitution.

4.      Nevertheless, the County has refused to acknowledge that the ministry is part of the Church, questioning how the Church and its ministry can be compatible.

5.      County officials have also held contradictory positions concerning whether the ministry is an accessory use, informing the Church its ministry is (i) not an accessory use; or that (ii) it is an accessory use but one that still needs a "special use permit"; and most recently (iii) "that an accessory use is not applicable to a new property use."  The Church argues that the County is legally wrong on all accounts.

6.      The County has created a cloud of uncertainty about the continued existence of the ministry at the Church and has harmed, and continues to harm, the ministry's students and faculty every day that cloud remains.

7.      The Church is suffering irreparable harm every day its constitutional and statutory rights are denied. The Church's damages here include its inability to freely pursue its religious mission and operate its ministry. Apart from this Court's intervention, the ministry may lose students and faculty as a result of the uncertainty caused by the County with respect to the future of the ministry at the Church.

8.      Because the fall school semester is quickly approaching, this Complaint is accompanied by a motion for a preliminary or permanent injunction and declaratory judgment seeking an emergency hearing to preserve the operation of the ministry and to help students, teachers, and faculty members in making informed decisions concerning the upcoming school semester and beyond.

## PARTIES

9.     Zoan Baptist Church is a Virginia not-for-profit corporation founded in 1853. The pastor of the Church is Jesse Booth, and his declaration is attached as **Exh A**, **Booth Declaration.**

10.     Spotsylvania County, Virginia, is a municipal corporation.

11.     The County, through its zoning administrators and code enforcement officers, is responsible for the enactment and enforcement of the Ordinance and the actions challenged herein.

## JURISDICTION AND VENUE

12.     This action arises under, *inter alia,* the Fourteenth Amendment to the Constitution of the United States and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") 42 U.S.C. § 2000cc 1, *et seq*.

13.     This Court has jurisdiction over the subject matter of this action by virtue of U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (authorizing declaratory relief); and 28 U.S.C. § 2202 (authorizing injunctive relief).

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(e) and 1402(a) and 5 U.S.C. § 703.

## BACKGROUND

I.     **The Zoan Baptist Church**

15.      The Zoan Baptist Church was founded in 1853. Since that time, it has been meeting at 5888 Plank Road, Fredericksburg, VA, (the "Property") situated in Spotsylvania County. Ex. A, at ¶ 2.

16.     The Church, pastored by Jesse Booth, seeks "to impact the greater Fredericksburg area with the message of Jesus Christ." *Id*. at ¶ 3.

17.     The Church believes that four spiritual disciplines are needed to be a fully devoted follower of Jesus Christ: (i) Grow in your relationship with Jesus Christ; (ii) Connect in biblical community; (iii) Serve in your God-given ministry; and (iv) Share the message of Jesus Christ. *Id*. at ¶ 4.

18.     Furthermore, the Church seeks to share the message of Jesus Christ "in a way that is understandable and relevant regardless of religious upbringing." *Id*.

19.     In seeking to "connect in biblical community" and share the message of Jesus Christ "regardless of religious upbringing," the Church has engaged, and continues to engage, in interdenominational work with other churches. For example, the Church has served the local community alongside Methodist and Pentecostal churches and has participated in joint Sunday services with those denominations. Pastor Booth learned the value of interdenominational work while doing personal ministry in South Africa, where he worked closely with Dutch Reformed churches, Nazarene churches, Pentecostal churches, and Zionist churches. *Id*. at ¶ 5.

20.     The Church also has a close relationship with a local Islamic center, to which it sold some of its land. It is Pastor Booth's belief that these relationships are integral to being a follower of Christ and fulfilling the Great Commission of spreading the message of God's love. (Matthew 28:18).  *Id*. at ¶ 6.

21.      The Church has approximately 450 members and meets on Sunday morning for worship and prayer, Tuesday morning for Bible study, and Wednesday evening for worship. The average Sunday attendance at the Church is approximately 280 persons. *Id*. at ¶ 7.

22.     The Church has conducted, and still intends to conduct, the following ministries and religious exercises, all of which are compelled by and integral to the sincerely held religious beliefs of the Church and its members:

> a.      weekly assembly of the congregation to worship (Hebrews 10:25);
> b.      weekly preaching and teaching, including speech relating to personal morality, God and culture (2 Timothy 4:2);
> c.      pastoral counseling for the disturbed, lonely and bereaved (Acts 20:28);
> d.      prayer meetings and Bible studies (Acts 1:13-14; Psa. 110; 2 Tim 3:16);
> e.      educational ministry and teaching (Exodus 18:20; Prov. 22:6);
> f.      singing and musical performances (Psalms 81:1-2);
> g.      baptisms, weddings, and communion (Matthew 28:19; Luke 22:19);
> h.      service projects for members of the congregation, the poor, youth, and the general community (James 1:27);
> i.      evangelism - sharing the Christian message and encouraging others to believe in Jesus the Messiah, particularly those who visit the church meetings (Matt. 28:16-20); and
> j.      financial giving to support the Church and its ministries to the poor and to the members in need (Mal. 3:8-10).  *Id.* at ¶ 8.

23.     The Church's building, pictured below, is approximately 13,784 square feet. *Id.* at ¶ 9.



24.     The Church has 92 parking spots with additional unmarked parking available as well. *Id*. An aerial view of the Church is below:



25.     In addition to the main worship center, the Church's facilities include three offices, six bathrooms, a kitchen, a fellowship hall that doubles as a cafeteria, and an education wing used for classrooms and assembly purposes. The Church has been using its education wing for religious instruction since the early 1960s. *Id*. at ¶ 10.

26.     The Church's education wing has 12 classrooms located on three different levels. These classrooms are equipped with desks, chairs, AV equipment, and chalkboards. *Id*. at ¶ 11.

27.     Approximately four years ago, the Church obtained a permit for the renovation of its classrooms. **Exh. B, 2013 Permit.**

28.     At that time, the County determined that "All rooms in the renovated area are accessory religious rooms to be used only during religious functions" and that the "renovated rooms are a continuation of Occupancy A-3 in accordance with the following sections of the 2009 IBC: section 303.1, Exception #5/Section 305.1/Section 308.5, last sentence." *Id*. These references provide as follows:

- Occupancy A-3 — Defined as assembly uses intended for worship . . . and other assembly uses . . . including, but not limited to: . . . places of religious worship . . . lecture halls, libraries . . . ." (**Exh. C, IBC Provisions**).

- Section 303.1, Exception #5 — "Accessory religious educational rooms and religious auditoriums with occupant loads of less than 100 are not considered separate occupancies." *Id*.

- Section 305.1— Educational Group E occupancy includes, among others, the use of a building or structure, or a portion thereof, by six or more persons at any one time for educational purposes through the 12th grade. Religious educational rooms and religious auditoriums, which are accessory to *places of religious worship* in accordance with Section 303.1 and have *occupant loads* of less than 100, shall be classified as A-3 occupancies. *Id*.

29.    Simply put, the County, under its building code, has designated the Church's education wing as "Assembly Group A" for religious assembly and "Educational Group E" for education through the 12th grade.

30.    It is, and has always been, the Church's vision and intention to utilize its education wing for an educational ministry to the fullest extent possible. It is the Church's view that education is a religious calling and a crucial part of the Church's mission. *Id*. at ¶ 12.

31.    The education wing remained largely unused by the Church during weekdays until a Christian school approached the Church looking for a home. *Id*. at ¶ 13.

## II.    The Summit Academy becomes a ministry of the Church.

32.    The Summit Academy ("Summit or "Academy") is a classical preparatory high school founded in 2016. Patrick Looby is the Academy's Academic Dean and his declaration is attached as **Exh. D, Looby Declaration, at ¶¶ 1-2**.

33.    Summit identifies as an "independent Christian school" whose mission is to "provide a single-sex, classical education that is rooted in a Christological Anthropology and the tradition of Catholic teaching." Summit is now a ministry of the Church. *Id*. at ¶ 3.

34.     The Academy's religious education is centered on "the lordship of Jesus Christ and this is in no way extraneous to the question of academic excellence." The Academy further maintains that its "mission is to ground students in education that opens them to the realization of who they are called to be in Christ." *Id*. at ¶ 4.

35.     The Academy has 20 students, 4 full-time teachers, and 2 adjunct teachers. The Academy is in good standing with the state and has legal authority to operate a secondary school in Virginia. *Id*. at ¶ 5.

36.     The Academy began meeting at the Property in August 2016. The County fire marshal has approved the educational wing for up to 50 people. *Id*. at ¶ 6.

37.     The Academy's academic calendar is from August 21st to June 2nd. Classes are held Monday through Friday, 8:00 A.M. - 3:00 P.M.  *Id*. at ¶ 7.

38.     Summit originally sought to locate at an Eastern Orthodox church but rejected that option and opted for locating at the Church because the Church already had an education wing and was well equipped for educational use. *Id*. at ¶ 8.

39.     Summit approached the Church sometime around March 1, 2016, seeking a place to locate its Christian school. *Id*. at ¶ 9; Ex. A, at ¶ 14.

40.     The Church was glad to allow Summit to use the education wing so long as the arrangement matched up with the Church's theological objectives. *Id*. at ¶ 15; Exh. D, at ¶ 9.

41.     Summit sent a representative to a Church board meeting to answer questions about safety and Biblical truth. After that conversation, the Church's board unanimously approved Summit's use of the education wing. *Id*.; Ex. A, at ¶ 15.

42.     The Church, which has longed for its facilities to be fully used for "Kingdom work," was excited to partner with the Academy. *Id*. at ¶ 16. Pastor Booth and Patrick Looby

have, from the very beginning of their relationship, viewed Summit as an extended ministry of the Church. *Id*.; Ex. D, at ¶ 10.

43.     The relationship between the Church and Summit had been overwhelmingly positive and the space is large enough for the Academy and the Church to share. *Id*. at ¶ 11.

44.     Sometime in early October 2016, however, a Church member filed a complaint with the County concerning the Academy's use of the Property. Ex. A, at ¶ 17.

45.     Accordingly, the County reviewed the complaint and researched the Property. Internal emails from the County reveal that the County's position at that time was that the Church could have a "church school" but "would need a SUP [special use permit] in order to conduct the private school . . . ." **Exh. E, Oct. 5 Email.**

46.     On October 12, 2016, Code Enforcement Officer Dena Slingerland contacted Pastor Booth and informed him that "a special use is required for a private school." **Exh. F, Emails**.

47.     On October 26, 2016, Ms. Slingerland sent Pastor Booth a similar email informing him that the County's legal department reviewed the situation and a special permit was needed.  *Id*.

48.     On December 14, 2016, County Zoning Administrator Kimberly B. Pomatto sent Pastor Booth an email stating that "because the private school operates as a separate entity from the church a special use permit is required to allow the use." Ms. Pomatto informed the church that in order to proceed, it would have to (i) hire an engineer, (ii) complete a "Generalized Development Plan, (iii) attend a pre-application meeting with a "Technical Review Committee," and then (iv) submit a special use application. *Id*.

49.     The entire special use process, however, would require the Church to, at the very least, (i) attend a pre-application conference, including one with a "Technical Review Committee"; (ii) host a community meeting; (iii) submit a series of forms and fees, some of which require architectural drawings, an engineer, a traffic impact study, and a city planner; (iv) wait for a "quality control" review of the submissions; (v) wait for review agencies to "perform a substantive analysis" and to provide comments; (vi) schedule a public hearing and post notices; (vii) wait for a case planner to prepare a staff report and recommendation; (viii) attend a public hearing and give presentation; (ix) submit a "Generalized Development Plan"; and (x) attend another hearing before the Board of Supervisors. **Exh. G, SUP Process.**

50.     The estimated cost to proceed under that process would have been between $15,000 and $20,000. Ex. A at ¶ 20. According to the County's website, the process takes anywhere from 3- 12 months to complete. See, Exh. G.

51.     In addition, Kimberly B. Pomatto informed Pastor Booth sometime around October 2016 that the Virginia Department of Transportation ("VDOT") would also need to do an assessment and that it was a probability that the Church would need to install turn lanes at the Property. This would have required the construction of a new lane from Plank Road. Based on previous experience with excavation, paving, moving power lines, and similar work, the Church estimated that this would have cost an additional $200,000.  Ex. A, at ¶ 22.

52.     On December 14, 2016, Kimberley B. Pomatto informed Pastor Booth that VDOT did not consider the Church's entrances to meet current design standards. This only confirmed to Pastor Booth and the Church that this entire process would be long and expensive. *Id*. at ¶ 24.

53.     Thus, the expense associated with the special use process and the additional regulations as a result of losing "grandfathered" status was, and remains, cost prohibitive and would harm the Church and the operation of its other ministries. *Id*. at ¶ 23.

54.     Pastor Booth then suggested a new arrangement which he believed would dispel the County's concerns. Under the new arrangement, the Academy would become an "official" (although the parties already considered it one) ministry of the Church, the Church would oversee the Academy's day-to-day activities, the Church would place two of its leaders on the Academy's board of directors, and the Academy would no longer pay rent. *Id*. at ¶¶ 25-26; Exh. D, at ¶¶ 14-15.

55.     Pastor Booth presented this suggestion to the Church's board of directors. On May 8, 2017, the Church's board of directors met and unanimously approved the plan. Exh. A, at ¶ 28; **Exh. H, Minutes.**

56.     That same day, the Academy's board of directors also met and approved the same. *Id*.; Ex. D, at ¶ 16.

57.     On May 9, 2017, Pastor Booth sent the County a letter informing it of the actions taken by the two boards of directors. Exh. A at ¶ 29; **Exh. I, May 9 Letter**.

58.     On May 15, 2017, Ms. Slingerland stated that the new arrangement had no effect and that the Church still needed a special use permit to legally operate its ministry. Exh. A at ¶ 30; **Exh. J, May 15 Letter**.

**III.    The County's zoning ordinance and additional actions by the County.**

59.     Because the Property is located outside Fredericksburg city limits, the County's Ordinance governs this matter. **Exh. K, Ordinance**. The Church is located in an "R-1" zoning district.

60.     The County's R-1 district provides that permitted uses in the district include:

- Accessory uses
- Expansion of a place of worship, but not expansion of seating capacity
- Expansion of public school[1]

61.     The R-1 district provides that special uses, that is those requiring a special use permit, include:

- Place of worship
- Private school
- Public school

62.     The Ordinance defines the relevant terms as follows:

- Accessory use — any use which (i) is subordinate to and serves a principal use; (ii) is subordinate in purpose, area and extent to the principal use served; (iii) contributes to the comfort and convenience of the occupants, business enterprise or industrial use served; and (iv) is generally located within the building housing the principal use served.

- Place of worship — a use located in permanent building(s) and providing regular organized religious worship and related incidental activities, except primary or secondary schools and child day care centers.

- Private school — a school primarily devoted to giving instruction in vocational, professional, musical, dramatic, artistic, dance, linguistic, scientific, religious, or other subjects, but not including (a) a child care center or adult day care center; or (b) a riding school, however designated. Private school may also include offering space for public assemblies including but not limited to community meetings, services as an accessory use.

63.     The term "church school," which the County has distinguished from a "private school," (See ¶ 45) is not found within the Ordinance.

64.     Relying on the sections of the Ordinance above, the County has denied the Church the ability to continue operating its ministry as of right.

---

[1] The Ordinance appears to be regulating physical expansion such as construction of a new building and not increased utilization of classrooms already constructed and approved.

65.     Throughout this ordeal, Pastor Booth and Mr. Looby have been the recipients of inappropriate comments from County officials concerning the religious nature of their relationship. The religious inquiry by the County began early on in the process when the County initially considered this matter. On October 5, 2016, Ms. Slingerland indicated that she researched the Academy and determined that it is a "college prep High School based in the Catholic religion." See Exh. E.

66.     On or about October 14, 2016, Pastor Booth and Mr. Looby met with Rick Roberson, Deputy Zoning Administrator, in Mr. Roberson's office. Mr. Roberson explained that even if the ministry was an accessory use, it would still need a special use permit. He also explained that although the Church was "grandfathered" and not subject to certain code requirements, the Church could lose its "grandfathered" status as a result of the special use process. Pastor Booth explained that the Church has always considered the school as its ministry but Mr. Roberson responded by commenting that the Church was Baptist. He then stated that normal Baptist schooling activities, like Sunday School, are fine but something like the Academy needed a special use permit. Ex. D, at ¶ 13; Ex. A, at ¶ 19.

67.     Pastor Booth and Mr. Looby have explained to the County that Summit is a ministry of the Church but the County has instead questioned the religious doctrine of the school and the Church, refusing to accept that the school could be a ministry of the Church. *Id.* at ¶ 19; Exh. D, at ¶ 12.

68.     Patrick Looby has on multiple occasions heard comments from County officials that the Academy could not be a ministry of the Church because the Church was "Baptist" and the school was "Catholic." He has corrected these misconceptions, informing County officials that although the Academy educates in the Catholic tradition, it is not a "Catholic school" but an

independent Christian school. He has further clarified that only a Catholic bishop can designate a school as "Catholic" and that the Academy was not designated as such. *Id*. at ¶ 17.

69.     On May 1, 2017, Pastor Booth had a phone conversation with Ms. Slingerland. During that conversation, Ms. Slingerland questioned how a "Catholic school" could be a ministry of the Church. Pastor Booth and her went back and forth regarding whether the school was "Catholic" or simply "Christian." Exh. A, at ¶ 27.

70.     On June 14, 2017, Mr. Looby spoke with Mr. Roberson who remarked that the Church's sanctuary is beautiful but that Summit could not use it because it is not "blessed." Patrick Looby responded that the Academy does not use the sanctuary. Mr. Roberson then questioned whether Catholics are not allowed to pray in an unblessed sanctuary. Ex. D, at ¶ 18.

71.     During that conversation, Mr. Roberson also told Mr. Looby that a school was in fact an accessory use to a church but that it would still need a special use permit. *Id*. at ¶ 19.

72.     That same day, Ms. Slingerland informed me that a school cannot be an accessory use to a Church. *Id*. at ¶ 20.

73.     After receiving the County's May 15th letter (See ¶ 58), the Church contacted legal counsel to evaluate the situation. On June 12, 2017, legal counsel submitted a letter to the County explaining that the Ordinance, and the manner in which it was enforced, violated the Church's constitutional rights. Ex. A, at ¶ 31; **Exh. L, June 12th Letter**. Notably, counsel informed the County that, *inter alia*, a school is an accessory use to a church, and should therefore be permitted as of right. *Id*.

74.     On June 21, 2017, the County responded stating that because a "private school is defined as a special permitted use" the Church would have to apply for a special use permit. The

County further asserted that "an accessory use is not applicable to a new property use . . . ." **Exh. M, June 21st Letter.**

75.    As a result of the County's actions, the ministry's teachers, students, and parents have experienced, and continue to experience, anxiety and uncertainty about the future of the ministry at the Church. Ex. A, at ¶ 35; Ex. D, at ¶ 24.

76.    The County has created a cloud of uncertainty about the continued existence of the ministry at the Church, thus causing harm to the parents and students who must make difficult decisions concerning the upcoming school semester. Parents do not want to send their children to a school without certainty that the school will continue to operate. *Id*. at ¶ 21; Ex. A, at ¶ 32.

77.    Likewise, faculty members and employees of the ministry need to know if they will continue to have a job at Summit. *Id*. at ¶ 33; Ex. D, at ¶ 22.

78.    Moreover, the County is forcing the Church to choose between operating its educational ministry and undergoing an expensive and burdensome special use process which would harm the Church and its other ministries. This is especially concerning if the special use process causes the Church to lose its "grandfathered' status and thereby be forced to comply with other regulations, such as, *inter alia*, constructing new turn lanes. Ex. A, at ¶ 34.

## COUNT I
## ESTABLISHMENT CLAUSE

79.    The allegations contained in all preceding paragraphs are incorporated here by reference.

80.    The County's Ordinance, and the manner in which it has been enforced, constitutes an infringement of the Church's rights under the Establishment Clause of the United States Constitution.

81.    The Church's arguments here are fully developed in its Memorandum of Law in Support of its Motion for Preliminary or Permanent Injunction and Declaratory Judgment, accompanying this Complaint.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT II
### VIOLATION OF RLUIPA, 42 U.S.C. 2000cc(a)
### SUBSTANTIAL BURDEN PROVISION

82.    The allegations contained in all preceding paragraphs are incorporated here by reference.

83.     Section 2(a) of RLUIPA provides that:

> No government shall impose or implement a land use regulation
> in a manner that imposes a substantial burden on the religious exercise of a
> person, including a religious assembly or institution, unless the government
> demonstrates that imposition of the burden . . .
>
> A.  Is in furtherance of a compelling governmental interest; and
> B.  Is the least restrictive means of furthering that compelling governmental
>      interest.

84.    The County's Ordinance, and the manner in which it has been enforced, has created a substantial burden on the Church's religious exercise.

85.    The County cannot demonstrate that the imposition of that burden is in furtherance of a compelling interest and the least restrictive means of furthering that interest.

86.    The Church's arguments here are fully developed in its Memorandum of Law in Support of its Motion for Preliminary or Permanent Injunction and Declaratory Judgment, accompanying this Complaint.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## COUNT III
## FREE EXERCISE CLAUSE

87.     The allegations contained in all preceding paragraphs are incorporated here by reference.

88.     The County's Ordinance, and the manner in which it has been enforced, constitutes an infringement of the Church's rights under the Free Exercise Clause of the United States Constitution.

89.     The County cannot demonstrate that its Code and actions are in furtherance of a compelling interest and the least restrictive means of furthering that interest.

90.     The Church's arguments here are fully developed in its Memorandum of Law in Support of its Motion for Preliminary or Permanent Injunction and Declaratory Judgment, accompanying this Complaint.

**WHEREFORE**, the Church respectfully prays that the Court grant the relief set forth in the prayer for relief.

## PRAYER FOR RELIEF

A.      Declare that the County's Ordinance violates the Establishment Clause of the United States Constitution; the Substantial Burden provision of the Religious Land Use & Institutionalized Persons Act, 42 U.S.C. 2000cc, *et. seq.*, and the Free Exercise Clause of the United States Constitution.

B.      Enjoin the County, its officers, agents, employees, attorneys and all other persons acting in active concert with it, from enforcing its Ordinance, both facially and as applied to the Church, to require the Church to obtain a special use permit in order to operate its ministry;

C.      Award damages for violation of the Church's constitutional and statutory rights and for the injuries and unlawful burdens it has incurred;

D.      Award the Church its costs and expenses of this action, including reasonable

attorney's fees, pursuant to 42 U.S.C. 1988, and other applicable law;

E.      Grant such other relief as this Court deems appropriate.

Respectfully submitted this 28th day of June, 2017.

**ZOAN BAPTIST CHURCH**

By:   ___/s/ Kevin A. Hoffman_____

| | |
|---|---|
| John W. Mauck, Esq. (IL #1797328) | Thomas Brecha, Esq. (IL #0288446) |
| Sorin A. Leahu, Esq.  (IL #6315515) | Peter Breen, Esq. (IL #6271981) |
| MAUCK & BAKER, LLC | THOMAS MORE SOCIETY |
| One N. LaSalle St., Suite 600 | 19 South LaSalle Street, Suite 603 |
| Chicago, Illinois 60602 | Chicago, IL 60603 |
| Telephone:  312-726-1243 | Telephone: 312-782-1680 |
| Facsimile:  866-619-8661 | Facsimile: 312-782-1887 |
| Email: jmauck@mauckbaker.com | Email: tbrejcha@thomasmoresociety.org |
| Email: sleahu@mauckbaker.com | Email: pbreen@thomasmoresociety.org |
| *Counsel for Plaintiff* | *Counsel for Plaintiff* |
| *Pending pro hac vice admission | *Pending pro hac vice admission |

James A. Davids, Esq. (VSB #69997)
Kevin A. Hoffman, Esq. (VSB #87632)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Telephone: 757-301-9995
Facsimile: 757-233-1084
Email: jim.davids@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Local Counsel for Plaintiff*